

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

WANDA D. MORGAN, )
)
    Plaintiff, )
)
  v. )  Case No. 06 C 4088
)
JO ANNE B. BARNHART, )  Magistrate Judge
Commissioner of Social )  Arlander Keys
Security, )
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER

  Plaintiff, Wanda D. Morgan, who suffers from carpal tunnel syndrome, applied to the Social Security Administration for Supplemental Security Income ("SSI") benefits. Her application was denied. She appealed that decision to this Court, and the case is now before the Court on cross-motions for summary judgment. Ms. Morgan seeks a reversal or a remand of the final decision of the Commissioner denying her application; the Commissioner seeks judgment affirming the denial of benefits. For the reasons set forth below, the Commissioner's Motion for Summary Judgment is granted, and the Plaintiff's Motion for Summary Judgment is denied.

### FACTS & PROCEDURAL HISTORY

  On October 3, 2002, Wanda Morgan was injured at work, when she pushed a case of motor oil on a register conveyor belt.

(Record at 155). Ms. Morgan claims that since being injured, she has been unable to work due to continuous pain related to carpel tunnel syndrome. Ms. Morgan applied for Supplemental Security Income on May 6, 2004. (Record at 92-93). The Social Security Administration (SSA) denied Ms. Morgan's application for Supplemental Security Income on July 23, 2004. (Record at 55-59). Ms. Morgan filed a Request for Reconsideration on September 20, 2004 (Record at 60), which the SSA also denied (Record at 61-64). Ms. Morgan then filed a request for a hearing on February 23, 2005. (Record at 65-67). Administrative Law Judge (ALJ) Robert G. White presided over her hearing on February 7, 2006. (Record at 19-52).

A.   Evidence Presented at the Hearing Before the ALJ

Ms. Morgan appeared for the hearing without an attorney. (Record at 20-21). Although the ALJ informed Ms. Morgan that an attorney could be of assistance to her and that the attorney could be paid through the Social Security system, Ms. Morgan declined and proceeded without representation. (Record at 22). Ms. Morgan testified that she lives with her 29 year-old son, who has Down's syndrome. (Record at 25). Ms. Morgan stated that her education consists of the completion of her sophomore year of high school. (Record at 23).

With respect to her work history, Ms. Morgan testified that, from 1989 to 1992, she worked as a cashier at a toy store. (Record at 24). Ms. Morgan testified that she was strictly a cashier and that she did not stock items or lift any heavy items while at work. (Record at 24). She testified that, from March of 1992 until May of 1992, she worked as a cashier in a grocery store, (Record at 24, 117). She also testified that, from June of 2000 to March of 2002, she worked as a home companion for handicapped persons. (Record at 24). According to her testimony, the home companion position did not require any special training. (Record at 24-25). She testified that the job involved assisting handicapped persons with chores and driving them to appointments. (Record at 24-25). Finally, Ms. Morgan testified that she worked at Meijer as a full-time cashier from April of 2002 until April of 2004. (Record at 25).

With respect to her injury, Ms. Morgan testified that, while employed at Meijer, on October 3, 2002, she sustained an injury to her wrists, arm, and shoulder while pushing a case of motor oil across a conveyor belt. (Record at 26, 155). She also testified that on March 15, 2004, following surgeries to both of her wrists, her doctor allowed her to return to light duty work, restricting her from pushing carts, scrubbing, stocking, or lifting more than 10 pounds. (Record at 33). Ms. Morgan

3

testified that, due to her injury, she received worker's
compensation from November of 2002 until February of 2004.
(Record at 30). After her injury, Meijer restricted her to part-
time work. (Record at 26). Also, she testified that Meijer
personnel would insist that she work in the back of the store,
and they would often send her home and tell her that they had no
work for her. (Record at 26). Ms. Morgan testified that she made
a total of $140.00 in 2003 while working at Meijer. (Record at
26). Although Ms. Morgan had previously worked the 11 PM to 7 AM
shift prior to her accident, she testified that, after her
injury, Meijer scheduled her to work shifts from 2 PM until 10
PM, which was problematic because she needed to be home during
the day for her son. (Record at 29, 37-38). Ms. Morgan testified
that her last day of work was in April of 2004 and that she had
not worked since. (Record at 27). She testified that Meijer
fired her in May of 2004 because she could not "do the job."
(Record at 26).

Ms. Morgan testified that the injury she sustained at Meijer
caused her to suffer with tendonitis in her shoulder, carpal
tunnel syndrome in both wrists, and damaged nerves and muscles in
her arm and shoulder. With respect to the effects of carpal
tunnel syndrome, Ms. Morgan stated that, on her right hand she
can only feel her pinky finger, even after undergoing carpal

4

tunnel release surgery on January 13ᵗʰ, 2003. (Record at 32). Ms. Morgan also testified that, since the surgery, her fingers are swollen more than they were prior to surgery. (Record at 32). In her left hand, she testified that both her index and ring fingers feel numb. (Record at 32). In addition, Ms. Morgan testified that her right wrist felt like there was a "tight rubbing," as if a rubber band was in her hand that would not release in order to expand her hand. (Record at 31). Ms. Morgan stated that the numbness in her right hand never went away, even after receiving multiple cortisone shots. (Record at 31). Ms. Morgan testified that, at the time of the hearing, she was taking Tylenol and Ibuprofen for her pain, and using cold packs and warm packs for pain and swelling. (Record at 33-34).

Ms. Morgan testified that she also suffers from asthma. (Record at 39). She stated that she takes Advair, an upper respiratory steroid, to control her asthma, and that she has not had an asthma attack that required her to go to the emergency room for the past eight years. (Record at 39). Ms. Morgan testified that she had recently talked with her doctor about receiving treatment for depression, (Record at 39), but she admitted that she had not received any treatment for depression prior to the time of the hearing. (Record at 39).

Ms. Morgan next described her daily activities. She testified that she wakes up in the morning around 7:30 AM. (Record at 35). Though she is able to do laundry and wash dishes, she testified that it takes her a lot of time to do either task, and that she is limited to doing one load of laundry per day. (Record at 34-35). Ms. Morgan testified that she must stop to take breaks during these tasks, and that to complete one load of laundry takes about three and a half hours. (Record at 34, 36). She is able to cook meals, bathe herself, and go shopping with either her daughter or her son. (Record at 36-37, 39). Ms. Morgan also testified that she can run a vacuum using her left hand, but she is unable to do any yard work. (Record at 39-40). Ms. Morgan testified that she attends church, and that she listens to Gospel programs, or watches the Gospel Channel on TV. (Record at 37, 40). She testified that she prepares meals for her son, helps him get into the bathtub, and drives him to appointments. (Record at 37-38). She also testified that she drives as infrequently as possible, because she is afraid that she may get into an accident. (Record at 38).

At the hearing, Ms. Morgan also presented, in the form of a letter, the testimony of her daughter, Marquisha Morgan. Ms. Morgan testified that her daughter's letter served to further explain her impairments. (Record at 40, 147). In the letter,

6

Marquisha Morgan stated that she is a mother, a full-time student at the University of St. Francis, and that she works 25 hours per week. (Record at 147). Marquisha's letter described how her mother's life has changed since the accident at Meijer. (Record at 147). She explained that her mother now needs assistance with everyday activities including opening jars, curling her hair, lifting objects while grocery shopping and holding objects for long periods of time. (Record at 147). Marquisha explained that once, when she was at a restaurant with her mother, her mother lost feeling in her right hand and dropped a pop on the floor. (Record at 147). Marquisha described this incident as "one example of many in which [Wanda Morgan's] hands have failed her." (Record at 147). With respect to her mother's pain, Marquisha stated that her mother complained of numbness and tingling in her hands for hours at a time, that her mother's hands were often swollen, and that her capacity to use her hands had decreased within the year immediately preceding the hearing. (Record at 147).

Vocational Expert Michael Blankenship ("VE Blankenship" or the "VE), also testified at Ms. Morgan's hearing. (Record at 40-49). First, the ALJ asked VE Blankenship how he would characterize the skill and level of exertion required by Ms. Morgan's past work. (Record at 41). VE Blankenship classified

most of Ms. Morgan's work as a "cashier II": a light and
unskilled occupation. (Record at 41). With regard to Ms.
Morgan's position as a home attendant for handicapped persons,
the VE Blankenship characterized it as a medium and semi-skilled
job. (Record at 41). The ALJ then asked VE Blankenship whether
Ms. Morgan, given her current limitations, would be able to
perform any of her past work. (Record at 42). The VE testified
that, in his opinion, Ms. Morgan would not be able to perform any
of her previous jobs. (Record at 42).

Next, the ALJ asked the VE whether Ms. Morgan, given her
impairments and limitations, would be able to perform other jobs
in the work force. (Record at 41-43). Specifically, the ALJ
asked the VE to determine what jobs may be available for a person
who: (1) is Ms. Morgan's age (43 years old); (2) has a 10th grade
education; (3) has Ms. Morgan's past work experience; (4) has a
residual functional capacity for light work; (5) is unable to
climb ladders, ropes, or scaffolds; (6) due to asthma, must avoid
concentrated exposure to pulmonary irritants; (7) is unable to
lift more than 10 pounds; and (8) must avoid repetitive use of
her right hand, both gross and fine dexterity, on a sustained
basis. (Record at 41-43).

The VE testified that gross and fine dexterity limitations
and the inability to repetitively use her right dominant hand

8

extremely limited the number of jobs available. (Record at 43-44). However, the VE concluded that a person with the limitations stated above would be able to work as an usher, as a lobby attendant, or in other related positions. (Record at 44). The VE testified that there are 1,852 usher and lobby attendant positions in the state of Illinois. (Record at 44). In addition, the VE testified that a person with Ms. Morgan's limitations would be able to perform retail sales positions in which the sales person would primarily talk with customers, though he admitted that, as a retail salesperson, Ms. Morgan would have to type on a keyboard. (Record at 44). The VE testified that at the time there were 7,864 retail sales positions in the state of Illinois. (Record at 44). Lastly, the VE testified that a person with Ms. Morgan's limitations would be able to perform the work of a security guard surveillance officer, and that Illinois had 3,651 surveillance officer positions. (Record at 44). The VE testified that the above three positions would be the only positions that he would "feel comfortable" listing to fit the ALJ's hypothetical. (Record at 45).

Following the VE's testimony, the ALJ described the retail sales positions available to Ms. Morgan as sellers of TV's, electronics, computers, or furniture. (Record at 47). The ALJ stated that this position did not require the person to lift the

9

products or scan them repetitively, but instead focused on the sales presentation. (Record at 47). The ALJ also described the security guard surveillance officer as a person that did not make arrests, but watched the TV monitors and occasionally walked the floor. (Record at 48). The ALJ then allowed Ms. Morgan, who was unrepresented, to ask the VE questions. (Record at 46). Ms. Morgan testified that she had looked into applying for a position as a security monitor, a greeter, and a jewelry retail sales person at Meijer, but that Meijer had refused to give her the positions, explaining that security guard surveillance officers do not just watch the monitors, they also make arrests. (Record at 50).

She also testified that Meijer would not allow her to work only the specific job in jewelry sales, but would require her to perform other jobs as well. (Record at 50). In addition, Ms. Morgan testified that Meijer offers a greeter position only during daytime hours. Ms. Morgan testified that she was unable to work during the day, because she had to be home with her son. (Record at 50). Following Ms. Morgan's testimony regarding the positions proposed by the VE, the ALJ explained that the law looks at whether there are jobs available that she can perform; it does not consider whether she can actually get those jobs. (Record at 52).

B. Medical Records

Ms. Morgan first saw Dr. Timothy Payne on October 15, 2002,
almost two weeks after she was injured at Meijer. (Record at
155). At the appointment, Ms. Morgan complained of shoulder and
neck pain on her right side, and she reported that the pain
radiated into her right arm. (Record at 155). Ms. Morgan also
complained of numbness in the fingers on her right hand. (Record
at 155). Dr. Payne found that Ms. Morgan had a cervical strain,
a rotator cuff strain, and tendonitis in her right shoulder.
(Record at 155-156). Dr. Payne also found that there was an
equivocal Tinel's[1] on Ms. Morgan's right hand; however, her
pinch and grip were intact. (Record at 155). Dr. Payne
prescribed Vicodin, Flexeril, and Celebrex and directed Ms.
Morgan to discontinue work with her right arm. (Record at 156).
He also directed her to begin therapy the following week. (Record
at 156).

At a follow-up appointment on October 22, 2002, Ms. Morgan
complained of pain in her right arm. (Record at 154). Dr. Payne
found that she had rotator cuff bursitis and recommended that she
abstain from work entirely. (Record at 154). One week later,

---

[1]*Tinel's Sign:* a tingling sensation in the distal end of a limb when
percussion is made over the site of a divided nerve. It indicates a partial
lesion or the beginning regeneration of the nerve. (Dorland's Illustrated
Medical Dictionary 1206 (26th ed. 1985)).

11

October 29, 2002, Dr. Payne found that Ms. Morgan's strength and range of motion in her shoulder had improved. (Record at 154). He prescribed Vicodin and Flexeril for pain and muscle spasm relief, and directed her to continue therapy four times per week. (Record at 154). One month later, December 2, 2002, Dr. Payne examined Ms. Morgan and found a positive Tinel's bilaterally, with her right side worse than her left. (Record at 152). Dr. Payne also found that Ms. Morgan had a positive compression test, a positive Phalen's test, and prayer signs. (Record at 152). Dr. Payne also diagnosed Ms. Morgan with paresthesias,[2] yet he noted that she was able to feel sensation from a sharp touch. (Record at 152). Additionally, Dr. Payne directed Ms. Morgan to undergo a CT arthrogram[3] of her right shoulder. (Record at 152). The results of the arthrogram were within normal limits, and Dr. Payne saw no evidence of rotator cuff tear. (Record at 152).

Dr. Payne performed carpal tunnel release surgery on Ms. Morgan's right wrist on January 13, 2003. (Record at 152). Four days later, Ms. Morgan was concerned with the appearance of her wound. (Record at 151). Dr. Payne noted that there was a slight

---

[2] *Parasthesias:* an abnormal or unexplained tingling, pricking, or burning sensation on the skin. (Encarta Dictionary, English, (2007), *available at* http://encarta.msn.com/dictionary_/paresthesia.html).

[3] *Carpal Tunnel Arthrogram::* a roentgenographic record after introduction of opaque contrast material into a joint. (Dorland's Illustrated Medical Dictionary 123 (26th ed. 1985)).

amount of ecchymosis[4] on her right wrist, however, he found that the appearance of her wound was normal and that her wound was "doing well." (Record at 151). At a later evaluation, Dr. Payne noted that Ms. Morgan did not have any major complaints of her fingers tingling and that her pain had diminished. (Record at 150-151). Dr. Payne directed Ms. Morgan to refrain from all work, and recommended that she begin therapy the following week. (Record at 151). On January 31, 2003, Dr. Payne noted that Ms. Morgan's wound appeared to be healed. (Record at 150). However, Dr. Payne also observed some eschar[5] on her wound, and he noticed that her wrist was stiff. (Record at 150). Dr. Payne reported that Ms. Morgan's pain had diminished, yet he still recommended that she continue to abstain from work. (Record at 150).

Two weeks later, on February 14, 2003, Dr. Payne recorded that Ms. Morgan's wound was healing nicely, with some thickened skin proximally. (Record at 149). Dr. Payne instructed Ms. Morgan to receive scar massage in addition to therapy, and he noted that at the time she was taking Tylenol for her pain. (Record at 149). Dr. Payne determined that Ms. Morgan was unable

---

[4]*Ecchymosis*: Bruise: bleeding into surrounding tissue caused by bruising. (Encarta Dictionary, English (2007), *available at* http://encarta.msn.com/dictionary_/ecchymosis.html).

[5]*Eschar*: A dry scab formed on skin that has been burned or cauterized. (Encarta Dictionary, English, (2007), *available at* http://encarta.msn.com/dictionary /eschar.html). http://encarta.msn.com/encnet/features/dictionary/dictionaryhome.aspx).

to work at that time, and he mentioned that Ms. Morgan may need to undergo carpal tunnel release surgery on the left wrist as well. (Record at 149-150). On March 11, 2003, Dr. Payne noted that Ms. Morgan's wound had healed and that her right hand was doing well. (Record at 149). However, Dr. Payne also reported that Ms. Morgan still had tightness and was still unable to work. (Record at 149). On April 18, 2003 Ms. Morgan cancelled left hand carpal tunnel release surgery, and she discontinued treatment with Dr. Payne. (Record at 149).

Disappointed that Dr. Payne released her to work with a 10 pound lifting restriction, Ms. Morgan changed physicians (Record at 191-192). She began treatment with Dr. Robert R. Schenk, a hand surgery specialist, (Record at 196), on April 18, 2003, (Record at 191). At the initial visit, Ms. Morgan informed Dr. Schenk that she had been diagnosed with relatively advanced bilateral carpal tunnel syndrome, which is more severe on the right side than on the left side. (Record at 191). Ms. Morgan also told Dr. Schenk that, after undergoing right carpal tunnel release surgery, she initially noticed improvement and thought that the surgery was successful. (Record at 191). However, she eventually noticed a feeling of "tightness" along her wrist scar, and she experienced recurrent symptoms of numbness and tingling in her right thumb, index, middle, and ring fingers. (Record at

14

192). At the appointment with Dr. Schenk, Ms. Morgan also complained of sharp pain between her second and third web spaces on her right hand. (Record at 192). Following therapy, Ms. Morgan found that her symptoms had not improved and that she was weak, with a right hand grip strength of only 5 pounds. (Record at 192). Ms. Morgan reported that she currently experienced scar tenderness and numbness, and she felt tingling in the fingertips of her right arm. (Record at 192). In addition, Ms. Morgan complained of muscle pain in her shoulder and tightness. (Record at 192). She also reported that symptoms in her left hand developed from overuse in an attempt to protect her right hand. (Record at 192). Ms. Morgan complained that pain and numbness in her left hand caused her to awaken almost every night. (Record at 192).

Dr. Schenk physically examined Ms. Morgan and noted that she had an 8 cm. mildly hypertrophic[6] and extremely tender scar, with significant ulnar pillar tenderness and moderate swelling over the base. (Record at 192-193). Dr. Schenk reported that Ms. Morgan demonstrated a positive Tinel's sign on her left side, with tingling at the wrist, and a negative Phalen's test

---

[6]*Hypertrophy*: A growth in size of an organ through an increase in the size, rather than the number, of its cells. (Encarta Dictionary, English, (2007), *available at* http://encarta.msn.com/dictionary_/hypertrophy.html).

bilaterally. (Record at 193). In addition, Dr. Schenk noted a positive median nerve compression test on Ms. Morgan's left side, with tingling extending to her thumb, index, middle, and ring fingers. (Record at 193). Ms. Morgan had nearly full wrist and hand mobility, yet her movements had to be performed slowly to protect her wrists. (Record at 193). Dr. Schenk also found that the intrinsic muscle tests showed that Ms. Morgan had good hand strength in both hands. (Record at 193). He determined that Ms. Morgan's grip strength at the time was 6 pounds on the right side and 31 pounds on the left side. (Record at 193).

After the physical examination, Dr. Schenk referred Ms. Morgan to the hand therapy unit to perform a series of tests to further evaluate her condition. (Record at 193). The testing showed that Ms. Morgan had diminished light touch on all of her fingers, (Record at 193), and that the motor nerve conduction times across the median nerve on both wrists were delayed. (Record at 194). Ms. Morgan's right median nerve and right ulnar nerve experienced diminished vibratory sensibility, while her left nerves were at a normal level. (Record at 193). Dr. Schenk scheduled a left wrist carpal tunnel release surgery on May 1, 2003, however, the surgery was pushed back from this date because Ms. Morgan was awaiting an independent medical evaluation. (Record at 187, 194). Dr. Schenk reported that the endoscopic

procedure that he would use would result in a much smaller scar without the pain and sensitivity that comes with the open procedure technique used by Dr. Payne. (Record at 195). Dr. Schenk indicated that Ms. Morgan should not work for at least six weeks, and he directed her to continue therapy for her right hand. (Record at 195).

Ms. Morgan returned for a follow-up appointment with Dr. Schenk on May 16, 2003. (Record at 189). At the appointment, Dr. Schenk injected her right wrist with Celestone and Carbocaine to diminish symptoms. (Record at 189). However, the injection resulted in increased irritation and numbness of her right small finger. (Record at 189). Ms. Morgan reported pressure and tightness in her left hand and numbness in her fingertips. (Record at 189). Furthermore, Ms. Morgan reported that she could not feel objects in her hand. (Record at 189). Upon physical examination, Dr. Schenk found a positive Tinel's sign with tingling to Ms. Morgan's left fingers, however, the Tinel's sign was negative on her right side. (Record at 189). Dr. Schenk reported that the Phalen's test produced pain in her right wrist. (Record at 189). He determined that Ms. Morgan's right hand grip strength was 8 pounds while her left hand grip strength was 20 pounds. (Record at 190). Also, Dr. Schenk noted that Ms. Morgan's right wrist scar tenderness and pain had decreased after

receiving a steroid injection, and he recommended an injection
for her left hand as well. (Record at 190). At the time, Ms.
Morgan was prescribed Celebrex that she was directed to take
daily. (Record at 190). In addition, Dr. Schenk discontinued Ms.
Morgan's therapy, because it had not improved her strength.
(Record at 190).

On May 30, 2003, Ms. Morgan returned to Dr. Schenk for a
steroid injection in her left wrist. (Record at 187). At the
appointment, Ms. Morgan reported that the numbness and tingling
in her left fingers had not improved. (Record at 187). In his
report, Dr. Schenk opined that Ms. Morgan's work duties
contributed to and/or aggravated her condition of carpal tunnel
syndrome. (Record at 187-188). Dr. Schenk classified Ms.
Morgan's carpal tunnel syndrome as "work-related." (Record at
188). Dr. Schenk listed restocking returns, running a cash
register, and assisting customers with lifting merchandise
between 13 to 14 pounds as activities that were harmful to Ms.
Morgan's condition. (Record at 187).

Over one month later, on July 2, 2003, Ms. Morgan returned
to Dr. Schenk's office. (Record at 185). Ms. Morgan informed Dr.
Schenk that the steroid injection had relieved the feeling of
tightness only temporarily. (Record at 185). She complained of
aching and pressure in the fingers of her left hand, as well as

18

tightness in her left palm. (Record at 185). Dr. Schenk noted that, although Ms. Morgan wore a splint at night on both wrists, her symptoms had not improved. (Record at 185). Upon physical examination, Dr. Schenk recorded a positive Tinel's sign, a positive median nerve compression test on Ms. Morgan's left side, and a negative Phalen's test. (Record at 186). Dr. Schenk also observed that the conduction time of the left median nerve was "markedly abnormal." (Record at 186). Dr. Schenk scheduled Ms. Morgan for a left endoscopic carpal tunnel decompression surgery on August 14, 2003.

On June 10, 2003, Ms. Morgan saw Dr. Fernandez for an independent medical evaluation. (Record at 182). Dr. Fernandez opined that Ms. Morgan's symptoms were not work related. (Record at 182). Dr. Fernandez determined that pushing a case of motor oil across a conveyor belt would not have caused the nerve damage that Ms. Morgan was suffering. (Record at 183). Dr. Fernandez also noted that Ms. Morgan was demonstrating symptoms in September, prior to the October incident. Dr. Fernandez opined that working as a cashier for only one year would not have contributed to Ms. Morgan's impairment. (Record at 183). Dr. Fernandez also concluded that Ms. Morgan was able to return to light work with the bilateral weight restriction of 10 or 20 pounds and a limitation on the repetitious use of tools. (Record

at 182). Dr. Fernandez determined that Ms. Morgan's right side had reached its maximum medical improvement. (Record at 182).

Dr. Schenk respectfully disagreed with most of Dr. Fernandez's conclusions. (Record at 182). Dr. Schenk agreed that the incident at Meijer would not have caused Ms. Morgan's carpal tunnel syndrome, however, he opined that it caused a "manifestation of symptoms." (Record at 183). Dr. Schenk reported that Ms. Morgan's repetitious daily work duties would have significantly aggravated her condition. (Record at 183). Finally, Dr. Schenk agreed that Ms. Morgan could return to light duty work, however, he recommended a maximum weight of 5 pounds rather than 10 or 20. (Record at 184). Dr. Schenk also noted that Ms. Morgan should be restricted from cashier duties and repetitive work. (Record at 184).

Ms. Morgan underwent left carpal tunnel endoscopic decompression surgery on November 25, 2003. (Record at 180). On December 1, 2003, Ms. Morgan returned for a post-operative appointment with Dr. Schenk, complaining that her left middle and ring fingers were numb. (Record at 178). Ms. Morgan told Dr. Schenk, however, that she felt more sensation in her other fingers. (Record at 178). Dr. Schenk directed Ms. Morgan to begin silicone putty exercises four times a day. (Record at 178). At a following appointment, on December 10, 2003, Ms. Morgan

continued to complain of numbness in her left, middle, and ring fingers. (Record at 176). Ms. Morgan stated, however, that her small finger, index finger, and her thumb had improved. (Record at 176). Ms. Morgan also reported that her left hand remained weak. (Record at 176). She complained of persistent numbness in her right hand as well. (Record at 176). Upon examination, Dr. Schenk noted that her left wound was well-healed and that Ms. Morgan had improved wrist mobility. (Record at 176). Dr. Schenk found that Ms. Morgan's left hand grip strength was 5 pounds, while her right hand grip strength was 10 pounds. (Record at 176). Dr. Schenk recommended that she begin occupational hand therapy three times a week. (Record at 176).

On January 7, 2004, Ms. Morgan returned to Dr. Schenk's office and reported that her pain had decreased from a level of 6 or 7 to a level of 2. (Record at 173). Ms. Morgan complained of recurring symptoms on the right hand. (Record at 173). At the time, Ms. Morgan's grip strength was 17 pounds on the left and 22 pounds on the right. (Record at 173). Dr. Schenk observed significant "marked scar hypertrophy." (Record at 173). A few weeks later, January 23, 2004, Ms. Morgan returned to Dr. Schenk's office, at which time he discontinued her scar massage therapy, because it had aggravated her scar. (Record at 171). Dr. Schenk reported that Ms. Morgan's left wrist had residual

scar hypertrophy and sensitivity. (Record at 171). However, Dr. Schenk reported that her physical therapist observed that Ms. Morgan's range of motion had increased, while her pain levels had decreased. (Record at 171). At the examination, Dr. Schenk found that her left hand grip strength was 25 pounds, while her right hand grip strength was 18 pounds. (Record at 171). Dr. Schenk gave Ms. Morgan another steroid injection and directed her to continue therapy in preparation for returning to work. (Record at 172).

One month later, on February 20, 2004, Ms. Morgan returned to Dr. Schenk's office and reported a "flare up" in the scar on her left wrist and an increase in pain level due to her strengthening exercises. (Record at 164). Ms. Morgan's therapist noted that she complained of pain in her left thumb. (Record at 164). She also complained of right hand weakness, numbness, and pain, including a burning sensation. (Record at 164-165). Ms. Morgan also complained about the difficulty that she experienced in performing daily activities within her home. (Record at 164). Dr. Schenk once again performed a series of tests to determine Ms. Morgan's condition. (Record at 164- 165). After comparing results to the previous tests taken on April 18, 2003, Dr. Schenk found that Ms. Morgan's fingertips on her left hand had returned to normal. (Record at 165). Compared to the April results, Dr.

22

Schenk noticed a "slight decrease" in the sensation of Ms. Morgan's right thumb, middle, and ring fingers, while her small finger had improved to a normal level, though the vibration sensibility of her right and left nerves did not change. (Record at 165). Ms. Morgan's motor nerve conduction times for both wrists improved significantly. (Record at 165). Dr. Schenk recommended a discontinuation of Ms. Morgan's therapy, and he allowed her to return to light work on February 23, 2004. (Record at 166). Dr. Schenk recommended that Ms. Morgan work 5 hours a day for 3 weeks, and then begin to work 8 hours per day. Dr. Schenk also recommended that she avoid pushing carts and scrubbing. (Record at 166).

The record indicates that Ms. Morgan returned to Dr. Schenk's office on March 10, 2004, after she resumed work at Meijer. (Record at 161). At that time, Ms. Morgan complained that her pain and swelling had increased, and that she had begun to feel a vibration in her left hand. (Record at 161). She informed Dr. Schenk that she was assigned to stock merchandise at Meijer, in which she lifted between 20 to 30 pounds. (Record at 161). As a result, Ms. Morgan stayed home and alternated cold and warm packs on her wrists. (Record at 161). Upon physical examination, Dr. Schenk found that Ms. Morgan exhibited mild tenderness and swelling of her left wrist, though she exhibited

normal wrist mobility. (Record at 161). Dr. Schenk recommended that Ms. Morgan refrain from stocking and lifting items in excess of 10 pounds, and he recommended that she be limited to hanging clothes and pricing merchandise. (Record at 162).

Ms. Morgan returned to Dr. Schenk's office on May 5, 2004, at which time she informed him that she had been fired from Meijer because she "could not perform the job." (Record at 158). Ms. Morgan informed Dr. Schenk that she had been placed on a 2 PM to 10 PM shift, which did not meet her family schedule needs. (Record at 158). She told Dr. Schenk that she had applied for a position as a greeter at Meijer, but that the position was given to another applicant. (Record at 158). At the appointment, Ms. Morgan reported that her right hand continued to feel "completely numb." (Record at 158). Dr. Schenk opined that "there is little to be offered to her" in regard to her right hand because second surgeries were rarely successful. (Record at 158). Dr. Schenk also concluded that Ms. Morgan had "permanent limitations" due to her carpal tunnel syndrome in both hands, especially her right hand. (Record at 158). Finally, On May 7, 2004, Dr. Schenk discharged Ms. Morgan from his medical care. (Record at 159).

At the request of the SSA, Dr. Paul Smalley, a medical consultant for the SSA, evaluated Ms. Morgan's physical condition On July 9, 2004. (Record at 200-207). Dr. Smalley completed a

24

physical residual functional capacity (RFC) assessment of Ms.
Morgan, basing his conclusions on prior clinical evidence and
reports of her daily activities. (Record at 200). In his
assessment, Dr. Smalley concluded that Ms. Morgan had the
following exertional limitations: (1) she is able to frequently
lift or carry a maximum of 10 pounds; (2) she is able to stand
and walk for a total of 6 hours in an 8 hour workday; (3) she can
sit for a total of 6 hours in an 8 hour workday; and (4) she can
push and pull an unlimited amount, other than as limited by the
amount that she can lift. (Record at 201). Dr. Smalley also
concluded that Ms. Morgan has no postural limitations, no
limitations in climbing ladders, ropes or scaffolds, or in
crawling. (Record at 202). In the evaluation, Dr. Smalley found
that Ms. Morgan had limitations to "fingering" (fine
manipulation), and from feeling. (Record at 203). However, Dr.
Smalley determined that Ms. Morgan had no limitation in reaching
in all directions, including over her head. Also, she was not
limited from "handling" (gross manipulation). (Record at 203).
Finally, Dr. Smalley established that Ms. Morgan had no
environmental limitations. (Record at 204).

On November 15, 2004, at the behest of the SSA, Dr. C.J.
Wonais examined Ms. Morgan. (Record at 208-210). Dr. Wonais
noted that Ms. Morgan was taking Advair, Albuterol, and Claritin

at the time of the examination. (Record at 208). During the examination, Ms. Morgan reported that she was limited to lifting 2 pounds with her right arm and 7 pounds with her left. (Record at 208). With regard to her daily activities, Ms. Morgan explained to Dr. Wonais that she was unable to unscrew a jar, run a vacuum, wash her car, or curl her hair. (Record at 208). Dr. Wonais noted that Ms. Morgan reported having asthma, yet, she also reported that she had not had an asthma attack in ten years. (Record at 209).

After the physical examination, Dr. Wonais determined that Ms. Morgan was 5 feet 4.5 inches tall, and weighed 223 pounds. (Record at 209). Dr. Wonais noted that Ms. Morgan had surgical scars on both wrists, that Ms. Morgan's range of motion for all major joints was normal, and that she had no difficulty getting on and off the examination table. (Record at 209). Dr. Wonais also noted that Ms. Morgan was able to make a full fist and appeared to have unimpaired dexterity in both hands. (Record at 209). Furthermore, Dr. Wonais found that the Tinel's sign was negative. (Record at 209). Dr. Wonais' impression of Ms. Morgan included a normal mental status, obesity, asthma that was well controlled, chronic pain in the right upper extremity, and a history of carpal tunnel in her right wrist. (Record at 209). At the end of the examination, Ms. Morgan was asked if all medical

26

complaints had been addressed, and she responded in the affirmative. (Record at 209).

## C.   The ALJ's Decision

The ALJ issued his decision on February 28, 2006, concluding that Ms. Morgan was not disabled as defined by the Social Security Act, and denying her claim for Supplemental Security Income. (Record at 17). Specifically, the ALJ found that Ms. Morgan had the RFC to perform light work with the following limitations: (1) she cannot lift more than 10 pounds; (2) she may not repetitively use her right hand on a sustained basis; (3) she may not climb ropes, ladders, or scaffolds; and (4) she may not work in an environment with concentrated exposure to pulmonary irritants. (Record at 12). The ALJ acknowledged that Ms. Morgan has exertional and manipulative limitations due to bilateral carpal tunnel syndrome. (Record at 12). However, the ALJ stated that he took these limitations into account when determining that Ms. Morgan was capable of performing light work as noted above. (Record at 12). Furthermore, the ALJ recognized that Ms. Morgan had asthma. (Record at 12). However, he found that her Advair prescription seemed to keep her asthma under control. (Record at 12).

The ALJ agreed that Ms. Morgan was unable to perform her past work. (Record at 12, 16). However, the ALJ also found

incredible Ms. Morgan's statements that she is precluded from working other types of occupations. (Record at 12). The ALJ found that the medical records showed improvement in her functional abilities following both carpal tunnel release surgeries. (Record at 15). Also, the ALJ noted that, at the time of the hearing, Ms. Morgan took "over-the-counter" medications, Tylenol and Ibuprofen, to relieve her pain. (Record at 15). The ALJ concluded that Ms. Morgan's claim that she could lift only 2 pounds with her right hand and 7 pounds with her left was not credible, because she was able to perform household activities that required her to lift more than 2 and 7 pounds respectively. (Record at 15). The ALJ noted that Ms. Morgan had testified that she was able to dress herself, prepare meals, wash dishes, do laundry, fold clothes, and grocery shop with her children. (Record at 15). The ALJ concluded that the activities listed above required Ms. Morgan to lift more than 2 to 7 pounds. (Record at 15).

The ALJ concluded that the primary reason that Ms. Morgan was not working had to do with her schedule and her son's needs, rather than her disability. (Record at 16). To support this conclusion, the ALJ noted that Ms. Morgan admitted that she would have attempted to work the position of jewelry salesperson and greeter, (Record at 16), however, she did not apply for or attain

either position, because she needed to work the night shift in order to be home with her son. (Record at 16). The ALJ concluded that jobs existed in significant numbers in the national economy that Ms. Morgan could perform given her age, education, work experience, and RFC. (Record at 16). The ALJ determined that Ms. Morgan would be able to perform jobs, such as usher/lobby attendant, retail salesperson, and security guard surveillance monitor. (Record at 17).

The ALJ's decision became the final agency decision when the Appeals Council denied review on May 23, 2006. (Record at 3-5). Ms. Morgan then filed this lawsuit, seeking review of the agency's decision and an award of Supplemental Security Income. Both parties moved for summary judgment. Ms. Morgan asks the Court to reverse the Commissioner's denial of her claim for Supplemental Security Income, or, in the alternative, to remand the case to the Commissioner for further proceedings. The Commissioner has filed a cross-motion for summary judgment, asking the Court to affirm the ALJ's findings.

## STANDARD OF REVIEW

A district court reviewing an Administrative Law Judge's (ALJ) decision must affirm if the decision is supported by substantial evidence and free of legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

Substantial evidence is "more than a mere scinitilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue,* 478 F.3d 836, 841 (7ᵗʰ Cir. 2007) (citing *Jens v. Barnhart,* 347 F.3d 209, 212 (7ᵗʰ Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan,* 912 F.2d 178, 181 (7ᵗʰ Cir. 1990).

Where "the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded. *Steele,* 290 F.3d at 940. An ALJ must articulate his analysis by "build[ing] an accurate and logical bridge from the evidence to [his] conclusions so that [the Court] may afford the claimant meaningful review of the SSA's ultimate findings." *Blakes ex rel Wolfe v. Barnhart,* 331 F.3d 565, 569 (7ᵗʰ Cir. 2003). In addition, although the plaintiff bears the burden of demonstrating her disability, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan,* 933 F.2d 581, 585 (7ᵗʰ Cir. 1991) (citing

*Smith v. Sec'y of Health, Education and Welfare,* 587 F.2d 857, 860 (7th Cir. 1978)). "Failure to fulfill this obligation is 'good cause' to remand for gathering additional evidence." *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000).

## SOCIAL SECURITY REGULATIONS

Supplemental Security Income is available only to claimants who can establish "disability" under the terms of the Social Security Act. The Social Security Regulations provide a five-step sequential analysis for determining whether a claimant is disabled. See 20 C.F.R. §§ 404.1520 and 416.920 (2001). Under the regulations, the ALJ is required to consider, in sequence, (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant is able to perform her past work; and (5) whether the claimant is capable of performing work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520 and 416.920; *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000) (citing *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir. 1995)). The claimant bears the burden of proof at steps one through four; at step five, the burden shifts to the Commissioner. *Id.* (citing *Knight,* 55 F.3d at 313). A finding of

31

disability requires an affirmative answer at either step 3 or step 5. *Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than step 3, precludes a finding of disability. *Id.*

DISCUSSION

Applying the five-step analysis discussed above, the ALJ first determined that Ms. Morgan had not engaged in substantial gainful activity at any time relevant to the decision. (Record at 14). At step two, the ALJ found that Ms. Morgan's carpal tunnel syndrome was a severe impairment, but that her asthma was not, given that it was controlled with medication. (Record at 14). At step three, the ALJ concluded that her carpal tunnel syndrome did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Record at 14). At step four, the ALJ first determined that Ms. Morgan had the residual functional capacity (RFC) to "perform light work that does not require lifting greater than 10 pounds, repetitive use of the right dominant hand on a sustained basis, climbing ropes, ladders or scaffolds, or working in an environment with concentrated exposure to pulmonary irritants." (Record at 12). From this determination, the ALJ concluded that Ms. Morgan was unable to perform any past relevant work as a cashier II, or as a home attendant. (Record at 16). At step 5, the ALJ concluded that,

given Ms. Morgan's age, education, work experience, and RFC, a significant number of jobs existed in the national economy that she was able to perform. (Record at 16). Accordingly, the ALJ concluded that Ms. Morgan was not disabled as defined by the Social Security Act, and was not entitled to Supplemental Security Income. (Record at 17).

Ms. Morgan argues that the ALJ's decision must be reversed or remanded for, essentially, four reasons: (1) the ALJ failed to meet the heightened duty to fully and fairly develop the record for an unrepresented (pro se) claimant; (2) the ALJ made improper credibility determinations; (3) the Vocational Expert's (VE) findings were invalid because they were based on an incomplete and improper RFC; and (4) the ALJ failed to follow SSR 00-4 by not addressing discrepancies between the VE's testimony and the *Dictionary of Occupational Titles* (DOT). The Court considers each argument in turn.

## A.  The ALJ Satisfied his Obligation to Develop the Record.

Ms. Morgan argues that the ALJ's decision should be reversed or remanded because the ALJ failed to develop a full and fair record.  More specifically, she argues that: (1) the ALJ relied on outdated medical evidence; (2) the ALJ failed to properly inquire how Ms. Morgan's pain affected her concentration, persistence, and pace; and (3) the ALJ failed to inquire about

33

the impact that Ms. Morgan's obesity would have on her ability to work full-time.

As mentioned above, and as Ms. Morgan correctly points out, the ALJ is required to develop a full and fair record during a Social Security hearing. *Thompson,* 933 F.2d at 585. "Failure to fulfill this obligation is 'good cause' to remand for gathering additional evidence." *Smith,* 231 F.3d at 437. Where a claimant is unrepresented by counsel, the ALJ has a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. . . ." *Smith v. Sec'y of Health, Education and Welfare,* 587 F.2d 857, 860 (7ᵗʰ Cir. 1978) (citing *Gold v. Sec'y of Health, Education and Welfare,* 463 F.2d 38, 43 (2d Cir. 1972)); *See also Thompson,* 933 F.2d at 585; *Binion v. Shalala,* 13 F.3d 243, 245 (7ᵗʰ Cir. 1994). "Failure to fulfill this special duty is good cause to remand for gathering of additional evidence." *Thompson,* 933 F.2d at 586 (citing *Cannon v. Harris,* 651 F.2d 513, 519 (7ᵗʰ Cir. 1981)). However, a "significant omission is usually required before [the] [C]ourt will find that the Secretary failed to assist pro se claimants in developing the record fully and fairly." *Luna v. Shalala,* 22 F.3d 687, 692 (7ᵗʰ Cir. 1994). Here, the ALJ fulfilled this heightened duty to develop a full and fair record for a pro se claimant.

## 1. The Medical Evidence was Complete and Sufficient.

Ms. Morgan argues that the ALJ relied on outdated medical evidence and that he failed to seek current medical evidence, which was inappropriate, she argues, given her testimony that her symptoms had recently worsened. The Social Security Regulations define a complete medical history as, "the records of [the claimant's] medical sources covering at least 12 months preceding the month in which you *file* your application." 20 C.F.R. § 416.912(d)(2). ALJs are not required to order consultative examinations, but may do so if an applicant's medical evidence is insufficient. *Skinner,* 478 F.3d at 844. If the ALJ is "concerned that the medical evidence [i]s insufficient to determine whether [claimant i]s disabled," then he should order more recent medical evidence. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). But an ALJ is not required to "update objective medical evidence to the time of the hearing." *Luna,* 22 F.3d at 693.

In *Smith,* the claimant suffered from degenerative arthritis and the most recent x-rays submitted with the medical evidence were ten years old; because of that, the Seventh Circuit held that the ALJ should have ordered new x-rays, especially because the x-rays he did have reflected the early stages of the claimant's disease. 231 F.3d at 437. In contrast, the medical evidence in the record here was just a little over a year old.

(Record at 19-52). Moreover, because the records in *Smith* reflected the claimant's condition at the beginning stages of his degenerative impairment, the ALJ knew or should have known that his arthritis likely worsened over the 10 years. *Smith*, 231 F.3d at 437. Here, there would have been nothing in the record to alert the ALJ to any likelihood that Ms. Morgan's symptoms would have worsened.

Ms. Morgan's medical records cover all of her surgeries and treatment, past the point where she had reached "maximum improvement" in her right wrist. (Record at 182 & 158). Ms. Morgan's medical evidence was complete and sufficient, extending as it does from October 15, 2002, through December 13, 2004. (Record at 156, 211). The record includes extensive medical evidence covering an almost two year period from two treating physicians, Dr. Payne and Dr. Schenk. (Record at 149-199). There is no hint in the record that the ALJ thought that Ms. Morgan's medical evidence was in any way deficient. Given the nature of Ms. Morgan's impairment and the extent of the medical evidence in the record, the Court is not persuaded that the record was, in any way lacking, or that the ALJ had any duty to supplement or further develop the record.

The ALJ was not Required to Inquire About the Affects of Ms. Morgan's Pain on her Concentration, Persistence, and Pace.

Ms. Morgan argues that the ALJ failed to inquire about the affects of her pain on her concentration, persistence, and pace while at work. She argues that the ALJ should have asked how long and how often she took breaks to use hot and cold packs on her wrists, because this evidence, along with pain affecting her concentration, would have been relevant to her RFC.

To support her argument, Ms. Morgan relies on *Carradine v. Barnhart.* The *Carradine* case was remanded, in part, because the ALJ failed to consider the claimant's psychologist's opinion that her pain impaired her concentration. 360 F.3d 751, 756 (7th Cir. 2004). Here, none of Ms. Morgan's treating or examining physicians opined that the pain of her carpal tunnel syndrome affected her ability to concentrate. (Record at 149-212). Nor did Ms. Morgan mention anything to this affect in her testimony (Record 20-40). Furthermore, The ALJ considered a significant amount of evidence regarding the effects of her impairment. At the hearing, the ALJ sufficiently questioned Ms. Morgan about her impairments and daily activities, (Record at 34-38), at which time Ms. Morgan testified that she must stop to take breaks while completing daily tasks around the house. (Record at 34). She also testified that, during her breaks, she uses cold and warm

37

packs for her pain and swelling. (Record at 33-34). Also, she testified about her pain, indicating that her fingers were swollen, many of her fingers were numb, and that she felt a "tight rubbing" sensation in her hand, as well as a tingling sensation in her fingers. (Record at 31-32). Because the ALJ considered a sufficient amount of evidence related to her impairment, and because the affect of her pain on her concentration was not brought to the ALJ's attention, either by medical evidence or testimony, the Court will not upset the ALJ's decision on this basis.

3. <u>The ALJ did not Fail to Develop the Record Fully and Fairly by not Inquiring about the Affect of Obesity on the Claimant's Ability to Work.</u>

Ms. Morgan argues that the ALJ failed to develop a full and fair record because he failed to consider the impact of obesity on her ability to work. The Commissioner "will consider only impairment[s] you say you have or about which [the SSA] receive[s] evidence." C.F.R. § 404.1512(a). Social Security Regulations require the ALJ to consider the "combined effect of all of the claimant's ailments, regardless of whether "any such impairment, if considered separately, would be of sufficient severity.'" 20 C.F.R. § 404.1523. *See also Clifford*, 227 F.3d at 873 (claimant had not claimed obesity as an impairment, however, the evidence should have alerted the ALJ that the claimant had

another relevant impairment that could affect her other impairments). There is nothing in evidence in Ms. Morgan's case, however, to alert the ALJ to another impairment that would affect her carpal tunnel syndrome.

Ms. Morgan did not claim obesity as an impairment in her application, nor did she mention it in her testimony. (Record at 20-52). In fact, there is very little mention of Ms. Morgan's obesity in the medical records, and there is no mention about how her obesity affects her ability to work. (Record at 149-212). The only mention of Ms. Morgan's obesity in the record is in Dr. Wonais' examination on November 15, 2004, in which he listed "obesity" in his impression of Ms. Morgan. (Record at 209). He listed her height and weight at the time as 64.5 inches and 223 pounds. (Record at 209). Neither of her long time personal treating physicians, Dr. Payne or Dr. Schenk, mentioned Ms. Morgan's obesity in their reports. (Record at 149-199). A therapist at Dr. Schenk's office documented Ms. Morgan's height and weight on April 18, 2003, as 62.25 inches and 220 pounds (Record at 197); however, obesity, and the affects thereof on Ms. Morgan's health were never mentioned (Record at 157-199).

Ms. Morgan argues that the additional weight from her obesity adds stress to her wrists and tendons. However, this complaint would have little affect, if any, on the RFC. Ms.

Morgan weighed 220 pounds in 2003, (Record at 209), therefore, she was obese during her personal doctor's examinations. The affect of this additional stress would be included in the doctor's assessments, because they examined the overall condition of her wrists and hands. If she had become obese after all of her medical examinations were taken by her doctors, then her obesity may have an added affect that was not included in their reports. Because the ALJ was presented with little evidence in the medical records mentioning obesity, and he was presented with no evidence describing the negative affects of obesity on Ms. Morgan's impairments, the Court finds that the ALJ was not required to inquire about the affects of Ms. Morgan's obesity.

B. The ALJ's Credibility Determinations Are Supported by Substantial Evidence.

Ms. Morgan argues that the ALJ's decision must be reversed or remanded because he made two improper credibility determinations: (1) the ALJ improperly discounted Ms. Morgan's testimony that she could lift only 2-7 pounds; and (2) the ALJ improperly relied on Ms. Morgan's use of over-the-counter medicine to determine that her pain was mild and easily controlled. The Court considers each argument in turn.

When reviewing an ALJ's credibility determination, the Court affords "special deference," because "hearing officers are in the best position to see and hear the witnesses and assess their

40

forthrightness." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000) (citing *Nelson v. Apfel,* 131 F.3d 1228, 1237 (7th Cir. 1997)). The Court will reverse an ALJ's credibility determination "only if the claimant can show it was 'patently wrong.'" Powers, 207 F.3d at 435 (citing *Herr,* 912 F.2d at 181). The ALJ must "specify the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir. 2003) (citing *Steele,* 290 F.3d at 942)).

1. The ALJ's Credibility Determination That Ms. Morgan Could Lift 10 Pounds or Less is Supported by Substantial Evidence.

Ms. Morgan argues that the ALJ made an improper assumption that she could lift 10 pounds or less, because, at the hearing, she testified that she could lift only 2 to 7 pounds or less. She argues that the ALJ based his credibility determination that she could lift more than 2-7 pounds on the fact that she was capable of performing household chores such as washing dishes, preparing meals, doing laundry, folding clothes, and going grocery shopping with her daughter or son. (Record at 15). The fact that a plaintiff "can perform some work activities on a limited basis does not mean that she is capable of performing full-time work." *Brennan-Kenyon v. Barnhart,* 252 F. Supp.2d 681,

41

697-698 (N.D.Ill. 2003). However, in this case, the ALJ made his determination taking into account other evidence as well.

The ALJ took into account medical evidence provided by Ms. Morgan's personal physicians. Within the same paragraph as the ALJ's credibility determination, he stated that the medical records "reflect improvement following the surgical procedures with an increase in her functional abilities." (Record at 15). In the same paragraph, the ALJ noted that Ms. Morgan had been given a "recommended 10 pound lifting restriction" by her treating physician Dr. Schenk. (Record at 15). In the paragraph immediately following this credibility determination, the ALJ noted that Ms. Morgan had been released from Dr. Schenk's care on March 11, 2004, with a restriction inhibiting her from "lifting greater than 10 pounds." (Record at 15). The ALJ specified reasons in addition to her daily activities, i.e. medical evidence from her treating physician, for finding that Ms. Morgan cannot lift greater than 10 pounds. (Record at 12). The Court is not persuaded that the ALJ's credibility determination is "patently wrong," therefore, the Court will not disturb the ALJ's credibility determination.

2.   The ALJ did not Make an Improper Credibility Determination Regarding Ms. Morgan's Pain.

Ms. Morgan argues that the ALJ improperly relied on her use of over-the-counter medication to make a credibility

42

determination that her pain was not as severe as she had
testified. Ms. Morgan is correct, that when assessing a
claimant's credibility about pain, an ALJ "must consider
subjective complaints of pain if the claimant can establish a
medically determined impairment that could reasonably be expected
to produce the pain." *Inodoranto v. Barnhart,* 374 F.3d 470, 474
(7th Cir. 2004). A claimant's use of pain medications is a
factor that "must be considered" if an allegation of pain is not
supported by the medical evidence. *Luna,* 22 F.3d at 691. The
ALJ's decision cannot be upheld if his reasoning "exhibits deep
logical flaws." *Carradine,* 360 F.3d at 756.

Initially, after reading the testimony and the ALJ's
decision, the Court cannot agree that the ALJ discounted Ms.
Morgan's subjective complaints of pain. In his decision, the ALJ
stated, "She has sought no further treatment since Dr. Schenk
released her in May of 2004 and she takes no medications other
than over-the-counter Tylenol and Ibuprofen." (Record at 15).
But this is simply a statement of her current condition. The
Court does not see that the ALJ drew any reference or reached any
conclusion based upon this statement. (Record at 15). In fact,
the ALJ included statements in his decision from Ms. Morgan's
complaints to her physicians, in which she described her pain.
For example, in his decision, the ALJ stated that the claimant

43

complained of "right wrist scar tenderness and numbness and tingling in the fingertips, as well as right upper arm and shoulder muscle pain and tightness." (Record at 15). The Court is not persuaded that the ALJ discounted Ms. Morgan's subjective complaints of pain.

## C. The Vocational Expert's Findings Were Valid.

As a corollary to her argument that the record was inappropriately undeveloped, Ms. Morgan argues that the ALJ's decision must be reversed or remanded because the Vocational Expert's findings, based on that record, are invalid. Ms. Morgan argues that the hypothetical that the ALJ posed to the VE failed to include certain limitations, including decreased concentration, complications from obesity and depression, the need to elevate her arms, and the need to take breaks to use hot and cold packs. As such, she argues the VE's RFC assessment was flawed, and the ALJ's findings at step 5, which were based on that assessment, are incorrect. Having already determined that the ALJ fully and fairly developed the record, the Court rejects this claim. The "hypothetical question posed by the ALJ to the VE must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994) (citing *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993)). The hypothetical

need not, however, consider "every detail of the claimant's impairments." *Id.*

Here, the ALJ asked the VE if any jobs were available for a person who: (1) is Ms. Morgan's age; (2) has Ms. Morgan's education; (3) has Ms. Morgan's work experience; (4) has a residual functioning capacity for light work; (5) is unable to climb ladders, ropes, or scaffolds; (6) due to asthma, must avoid concentrated pulmonary irritants; (7) is unable to lift more than 10 pounds; and (8) must avoid repetitive use of her right hand, both gross and fine dexterity, on a sustained basis. (Record 41-43). The ALJ's hypothetical was thorough and complete, and took into account Ms. Morgan's limitations due to both carpal tunnel syndrome and asthma, as supported by the record.

### D. The ALJ Followed SSR 00-4.

Ms. Morgan argues that the ALJ's decision must be reversed or remanded, because the ALJ failed to follow SSR 00-4 by not addressing discrepancies between the VE's testimony and the *Dictionary of Occupational Titles* (DOT). "When no one questions the vocational expert's foundation or reasoning, an [ALJ] is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the Dictionary's." *Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir. 2002) (explaining that the DOT simply is a tool that records other unexplained conclusions,

45

and is itself not even subject to cross-examination). SSR 00-4p requires the ALJ to "explain in the determination or decision how any conflict with the Dictionary. . . was resolved," *only* if "the discrepancy was 'identified.'" *Id.* at 446-447. A discrepancy is "identified," if "the claimant (or the ALJ on his behalf) noticed the conflict and asked for substantiation." *Id.* at 447. To raise a discrepancy after the hearing is too late. *Id.* Though, of course, where, as here, the ALJ is supposed to raise things on the plaintiff's behalf and allegedly fails to do so, this principle would seem to pack less of a punch.

The VE testified that, given Ms. Morgan's limitations, a person with her RFC would be able to work: (1) as an usher and lobby attendant, with 1,852 positions in the state of Illinois; (2) as a retail salesperson, with 7,864 positions in the state of Illinois; and (3) as a security guard surveillance officer, with 3,651 positions in the state of Illinois. (Record at 44). Ms. Morgan argues that this assessment is inconsistent with the DOT for two reasons. First, Ms. Morgan argues that all three positions require three to six months of training, and each requires reasoning, math, and linguistic development beyond her 10th grade education. There is nothing in the record to explain why she would be unable to complete a short training program, and she has not offered anything further on the point.

Furthermore, although the DOT offers some support for her argument that these jobs require some advanced math skills, the Court is not inclined to draw any significance from that fact. The DOT lists tasks that an usher and lobby attendant would perform including: collecting tickets, assisting patrons to find seats, examining tickets, distributing programs, and greeting patrons, among others. (Dictionary of Occupational Titles: Usher, Lobby Attendants, Ticket Takers). Although the DOT also lists "knowledge of numbers...including arithmetic, algebra, geometry, calculus, [and] statistics," as knowledge that may be required of an usher and lobby attendant, the only task listed in the DOT that mentions anything to do with math is counting and recording tickets. (DOT). Counting and recording tickets does not require the claimant to have knowledge of Calculus. Therefore, the Court is not persuaded that, given the tasks required of an usher and lobby attendant, the ALJ should have considered a discrepancy between the VE's testimony and the DOT. Even if the math skills required for the retail sales position are beyond Ms. Morgan's education, there is still a significant number of jobs that she can perform in the national economy: 1,852 usher and lobby attendant positions and 3651 security guard surveillance officers positions in Illinois.

In addition, the VE's final assessment was not questioned for its foundation or reasoning by either the claimant, or the ALJ acting on the unrepresented claimant's behalf. (Record at 44-51). Moreover, although Ms. Morgan now seems to be arguing that the process somehow failed her because no one explored the VE's findings about what jobs she could do, that is simply not the case. The ALJ did question the VE's findings; the VE initially proposed that Ms. Morgan could be an interviewer, but the ALJ reminded the VE that she could not use her right hand repetitively, and so they added a "gross and fine dexterity" limitation for her hands to his hypothetical. (Record at 43). The ALJ also reminded the VE that Ms. Morgan was unable to work in an environment such as a factory, or a bus depot, because the fumes could irritate her asthmatic condition. (Record at 45).

Similarly, Ms. Morgan asked follow up questions about the jobs referenced by the VE. She specifically asked the VE what the security guard surveillance officer position entailed, because she was concerned that she would have to approach people and make arrests (Record at 48); the VE explained that the security guard surveillance position would not involve such tasks, but would involve surveying premises via monitors. (Record at 49). This is the only question she asked relating to her RFC; the remainder of her questions and comments make clear that her

primary concern was not whether she could do the job, but whether she could get the shifts necessary to allow her to satisfy her child care responsibilities. (Record at 50).

In short, the Court sees nothing in the DOT, or in the way in which the record was developed on this issue, that would require a remand.

CONCLUSION

For the reasons set forth above, the Court finds that the ALJ's decision is supported by substantial evidence. Specifically, the Court finds that the ALJ fulfilled his heightened duty to develop a full and fair record for an unrepresented claimant, the ALJ made credibility determinations that were supported by substantial evidence, the VE's findings were valid and based on a proper RFC, and the ALJ properly followed SSR 00-4. Accordingly, the Court grants the Commissioner's Motion for Summary Judgment [24], and denies Plaintiff's Motion for Summary Judgment [19].

Dated: August 10, 2007

ENTER:

ARLANDER KEYS
United States Magistrate Judge